In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-1013, 11-3008 & 11-3082

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONNANITA FLUKER, ROY FLUKER, III,
and ROY FLUKER, JR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:08-cr-00540—**David H. Coar** and
**Gary S. Feinerman**, *Judges.*

ARGUED SEPTEMBER 5, 2012—DECIDED OCTOBER 26, 2012

Before BAUER, MANION, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* This case proves the old adage, "If something sounds too good to be true, it probably is." Following a three-week trial, Roy Fluker, Jr. ("Roy Jr."), Roy Fluker III ("Roy III"), and Ronnanita Fluker ("Ronnanita"), (collectively, the "Appellants"), were found guilty of charges related to their participation in various fraudulent, Ponzi-like schemes that duped victims into

investing millions of dollars into programs that were destined to fail. The Appellants were sentenced to prison at separate sentencing hearings. In this consolidated appeal, Roy Jr. and Roy III challenge three of the district court's evidentiary rulings that they believe deprived them of a fair trial. Roy III also contends that the district court erred in calculating his sentence under the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"). Ronnanita challenges the district court's decision to provide the jury with an "ostrich" instruction, as well as the calculation of her sentence. We affirm all of the convictions and sentences.

## I. BACKGROUND

From early 2005 until late 2007, Roy Jr., together with his son Roy III and his daughter Ronnanita, devised and participated in various schemes that defrauded thousands of people. Roy Jr. founded a company *All Things in Common, LLC*, which did business under the name *More Than Enough, Inc.* ("MTE"), in May 2005, and later a second company, *Locust International, LLC* ("Locust"), in January 2006. Using the MTE business, the Appellants created, marketed, and carried out a "Spend and Redeem Program" and a "Housing Program" for roughly eighteen months until the programs collapsed. Roy Jr. generally created and structured the particular program's terms while Roy III and Ronnanita were responsible for overseeing and executing the specific transactions.

The Spend and Redeem Program consisted of two parts. First, participants would "spend" by paying MTE an initial minimum payment of $500, with a maximum of $5,000. Then, in exchange for the participants' initial payments, MTE would provide the participants with certificates that they could "redeem" at the monthly "venue" meetings (to be discussed later) for a monetary payment. The Spend and Redeem Program promised participants that they would receive a twenty-five percent return on their total investment every month for twelve consecutive months—i.e., a guaranteed 200% return after one year. In other words, a $500 initial payment would entitle the participant to receive $1,500 after twelve months; a $5,000 initial payment would yield a $15,000 payment after twelve months. Participants could contribute up to $20,000 per year to the Spend and Redeem Program, plus additional money for children under eighteen. Witnesses testified at trial that the Spend and Redeem Program was just a "hook;" the real money was made from the Housing Program.

The Housing Program was more complex, as MTE offered two options within the program: the "Reverse Mortgage Program" and the "35 Percent Equity Program." Which program an individual could participate in depended on the individual's credit scores, loan balances, and the amount of equity the individual had in his home.

The Reverse Mortgage Program required the participant to own a minimum of seventy-five percent equity in his home. To participate, the participant would

refinance or sell his home and pay MTE from the equity proceeds an amount equal to at least seventy-five percent of the home's value. In return, the Appellants told the participant that the equity money would be used to repay a traditional thirty-year loan in five years and that MTE would be solely responsible for paying the lenders on behalf of the participant-borrowers. The Appellants also promised to make monthly payments to the participants in an amount equal to roughly one percent of the total loan value.

In order to qualify for the 35 Percent Equity Program, participants were required to own a minimum of thirty-five percent equity in their homes. Like the participants in the Reverse Mortgage Program, to join the program, participants needed to pay MTE from the equity proceeds from the sale or refinancing of the home. But under this program, the amount only needed to be thirty-five percent of the home's value. These participants were told that they would not be responsible for making any payments during the first six months after the transaction. After the six-month grace period, the participants would be responsible for making monthly payments to MTE—later Locust—for the next fifty-four months until the loan was paid off. The Appellants claimed these payments would be approximately one-half of the participant's previous mortgage payment. Regardless of which Housing Program subprogram an individual participated in, the Appellants essentially promised that the program would allow the participants to do two things: reduce their monthly

mortgage payments and own their homes mortgage-free within five years. The reality is that the Appellants were causing the participants to take out a loan with a high interest rate and a principal balance that was significantly more than the previous balance owed.

In the event an individual was otherwise ineligible to participate in the Housing Program but had a sufficient credit score, MTE would provide an "A-Buyer" to facilitate the individual's participation. A-Buyers were essentially straw purchasers for the various transactions; they were other MTE members who had credit scores that would allow them to qualify for loans. Thus, the A-Buyer would take out a loan to "purchase" the home of a Housing Program participant who was otherwise ineligible for the program, but the seller-participant would continue to live in the home rent free and simply comply with the payment terms of whatever subprogram he was participating in. The terms usually required the seller-participants to make monthly payments to MTE. The Appellants assured the A-Buyers that MTE would accept all responsibility under the loan for paying the lender.

The Appellants, in addition to Hayward Borders and six other individuals who became MTE's Board Members, set out in June 2005, to market and promote the aforementioned programs. Monthly "venue" meetings were held at various churches and hotels throughout the Chicagoland area at which Roy Jr., Roy III, or another MTE employee explained MTE's programs to those in attendance. The Appellants claimed the programs

would "develop an economy basically for the African-American community" and would teach individuals about "functional spending." Each venue had a capacity of one hundred members. When a given venue reached its maximum capacity, the Appellants would open another one. New venues were opened in Wisconsin, Nevada, Florida, Georgia, and Texas before the Appellants' scheme collapsed. Ronnanita's role at the meetings involved assisting Roy Jr. with his presentations, typically by providing information from her computer files, and collecting cash from interested participants.

In response to questions as to how the Appellants could promise such significant returns from the programs, Roy Jr. stated that MTE had invested in the foreign market exchange and had achieved significant returns by buying and selling currencies. Roy Jr. also represented to participants that he had invested in real estate or gold mines in Africa. When pressed for details, Roy Jr. claimed that the investment strategies could not be revealed because they were patented. On one occasion, Roy Jr. compared his refusal to provide details of MTE's investment strategies to KFC's refusal to provide customers with its fried chicken recipe. Roy III made similar misrepresentations regarding MTE's investments and claimed patents. If an active participant had a question about a program or needed something done, he would go to Ronnanita, who was known as being "second in command" to Roy Jr.

As time passed, more investors were enticed into participating in the schemes. Although the earliest Spend

and Redeem Program participants were paid back millions of dollars, many of them were induced to reinvest much of their earnings and to encourage other potential participants to join.

Around March 2006—roughly nine months after the scheme began—the Appellants introduced MTE's "Presidential Club," also known as the "Big Boys Club," to about thirty of MTE's past Spend and Redeem Program participants. Members of this group were required to invest at least $50,000, but, unlike participants in the original program, they would have to wait two months after their initial investments before they would begin to receive their first twenty-five percent payments.

Each of the Appellants' representations and promises to the participants were false, and the programs had absolutely no chance of succeeding. The money the Appellants received was used for a multitude of expenses, including but not limited to the MTE Board Members' salaries and cars, tropical vacations, and purchasing real estate. Hundreds of thousands of dollars were used for the Appellants' personal expenses and affairs, like payments for Roy III's wedding. More significantly, the money coming in was not kept in separate bank accounts, so the precise amount generated from each program or subprogram could not be tabulated. For example, equity money received from the Housing Program was often deposited into the same bank accounts as the Spend and Redeem Program proceeds. Despite the Appellants' assurances that the Spend and Redeem Program was separate and distinct from the Housing

Program, all the monthly mortgage payments that MTE and Locust made to lenders on behalf of the Housing Program participants and A-Buyers were made directly from the money contributed by both Spend and Redeem and Housing Program participants. Roy Jr. had at least eighteen accounts at three different national banks that were used to pay whatever expenses were due. Money was freely transferred between the accounts whenever necessary, usually by Ronnanita at Roy Jr.'s direction.

The scheme as a whole began to collapse in the summer of 2006, roughly twelve months after its inception and three months before the banks froze the Appellants' accounts. As with all Ponzi schemes, the money coming in had to exceed the money going out. Before the freeze in September 2006, Grace Edwards, the MTE Board Member who prepared the "redeem" checks each month for the Spend and Redeem Program participants, recognized that the incoming cash flow was insufficient to cover the amounts due. Roy Jr. told Edwards to let him know how much money was needed each month to complete the redemptions, and she obliged. Edwards, who only had access to one account, then noticed deposits totaling hundreds of thousands of dollars were made to that account each month. This continued until the scheme's ultimate demise. It was also around this time when the Appellants caused monthly mortgage payments made by MTE and Locust to be late. Housing Program participants and A-Buyers began receiving unexpected telephone calls from lenders advising them of overdue payments, and they attempted to contact

the Appellants about these issues. The Appellants rarely answered or returned the calls.

The State of Illinois Attorney General served Roy Jr., as well as All Things in Common, on September 20, 2006, with an amended Temporary Order of Prohibition entered by the Illinois Securities Department.[1] This led to the banks putting a hold on MTE's accounts. Nevertheless, the Appellants continued to operate venue meetings under the company name Wealth Creation Institute as well as solicit new participants for both programs. This time, however, the Appellants referred to the Spend and Redeem Program as an "educational program or school."

In order to reduce discontent among Housing Program participants who had heard rumors about MTE, Ronnanita sent letters in January 2007 explaining that Locust was now responsible for MTE's mortgage program and that the participants had no reason to worry. In actuality, MTE had stopped making payments on the participants' mortgages around late 2006, which eventually caused many of the participants to default on their mortgages and lose their homes to foreclosure. Some Housing Program participants continued making monthly payments to the Appellants in 2007, even after the Appellants were legally ordered to cease their MTE operations.

---

[1] Neither Roy III nor Ronnanita was named in this order, and Ronnanita's Presentence Investigation Report ("PSR") concluded that the evidence did not support a finding that either possessed knowledge of the order.

By the time the overall scheme ended in 2007, the Appellants had already received more than $16 million from the Spend and Redeem Program and more than $2.6 million from the Housing Program. Over 3,000 people from the Spend and Redeem Program and more than 25 people from the Housing Program were affected in only eighteen months. For the scheme to have continued, the Appellants would have needed to generate $45 million over approximately the next year to make the Spend and Redeem Program "redeem" payments and at least $7 million over the next five years to make the required Housing Program payments. Bank records demonstrate that the money the Appellants received was never invested in any significant way in order for a return to have been generated. As the district court put it, the scheme was a "virtual impossibility."

Roy Jr. admitted the fraudulent nature of the Spend and Redeem Program in a consent order of prohibition signed with the Illinois Secretary of State Securities Department on October 8, 2007 (the "Consent Order"). Roy III signed a separate consent order of prohibition regarding the Spend and Redeem Program on October 5, 2007.

On July 9, 2008, a Grand Jury in the Northern District of Illinois returned an eleven-count indictment against Roy Jr., Roy III, and Ronnanita for their conduct violating 18 U.S.C. §§ 1341, 1343—mail and wire fraud. The Appellants were tried together and, after a three-week jury trial, convicted on May 25, 2010. Roy Jr. was convicted on all eleven counts. Roy III was found guilty

on five counts of wire fraud, and Ronnanita was found guilty on five counts of wire fraud and three counts of mail fraud. The Appellants each filed post-trial motions, which the district court denied in their entirety.

At sentencing for Ronnanita on December 16, 2010, the district court accepted the PSR's findings, but also acknowledged that "Roy Fluker, Jr., is the person who is most responsible for what happened." Accordingly, even though the Sentencing Guidelines called for a sentencing range of 210 to 262 months' imprisonment, the district court sentenced Ronnanita to ninety-six months' incarceration, plus restitution in the amount of $10,783,960.45.[2] On August 16, 2011, the district court sentenced Roy III to ninety-six months' imprisonment with restitution in the amount of $7,336,957.49. Roy Jr. was sentenced on August 25, 2011, to 180 months' imprisonment plus $7,336,957.49 restitution. This consolidated appeal followed.

## II. DISCUSSION

### A. Evidentiary Rulings

Roy Jr. and Roy III challenge the admission of three pieces of evidence. They assert that this evidence was

---

[2] Ronnanita was sentenced by Judge David H. Coar, who presided over the Appellants' trial. On January 1, 2011, before Roy Jr. and Roy III were sentenced, Judge Coar took inactive status, and the case was reassigned to Judge Gary S. Feinerman, who subsequently sentenced Roy Jr. and Roy III.

improperly admitted and its admission denied them a fair trial. We review the admission of this evidence for abuse of discretion. *United States v. Chapman*, No. 11-2951, 2012 U.S. App. LEXIS 18379, at *11 (7th Cir. Aug. 30, 2012).

### 1. Roy Jr.'s Consent Order[3]

Roy Jr. signed the Consent Order on October 8, 2007, after the Attorney General of the State of Illinois initiated a civil action against him because of the fraudulent nature of the Spend and Redeem Program. In the Consent Order, Roy Jr. acknowledged that he failed to disclose the following material facts to Spend and Redeem Program participants:

(a) MTE had no substantive investments capable of producing returns sufficient to repay Investors;

(b) MTE was using Investors' funds to meet MTE and [Wealth Creation Institute's] obligations to repay prior Investors; and

(c) MTE's ability to repay Investors was dependent on MTE's continuing to fraudulently raise funds from future Investors.

Roy Jr. also acknowledged that "he had the opportunity to consult with an attorney regarding this matter;" the

---

[3] Roy III originally challenged the admission of the consent order he signed but later stipulated that the Government could present a redacted form of his consent order to the jury.

"Stipulation [was] entered into freely and voluntary;" and he was not promised anything with regard to "civil or criminal liability arising from the facts underlying this matter."

Roy Jr. filed a motion *in limine* to exclude the Consent Order. The parties discussed the motion during a status hearing on June 30, 2009, and the district court stated, "[A]s to the general notion that none of this comes in, that's not going to happen." Proceeding in light of the district court's comment, Roy Jr. entered into a stipulation with the Government that the Consent Order would either be admitted in its entirety or with certain portions redacted. The district court instructed the parties that "there should be an instruction at the end, and there should also be an instruction when this evidence comes in[,] that it's only to be used for the person who signed the consent and no other defendant." At trial, the entire Consent Order was admitted without redaction, accompanied by an instruction admonishing the jury to consider the Consent Order only against Roy Jr.

The brief and reply brief for Roy Jr. and Roy III are unclear as to who exactly is challenging the admissibility of the Consent Order, Roy Jr. alone or Roy Jr. and Roy III.[4] Either way, the limiting instruction, coupled

---

[4] Roy Jr. and Roy III filed a consolidated brief and reply brief. In the sections discussing the admissibility of the Consent Order, the parties are inconsistent, first stating that "Roy

(continued...)

with the fact the Consent Order did not contain any references to Roy III, sufficiently removed any unfair prejudice to Roy III, *see United States v. Javell*, No. 11-3044, 2012 U.S. App. LEXIS 18377, at *9-11 (7th Cir. Aug. 30, 2012) (explaining that the admission of a co-defendant's confession is permissible at trial if the admission is accompanied by a limiting instruction and does not facially incriminate the defendant), and we, thus, move on to Roy Jr.'s argument.

Roy Jr. maintains that the Consent Order he signed should not have been admitted because it was highly prejudicial and unnecessarily confusing to the jury, inserting state civil procedure issues into a federal criminal trial. The Government contends the information was relevant, as it contained factual admissions related to the fraud allegations, and not unfairly prejudicial. We find that Roy Jr. has waived his ability to contest the Consent Order's admission.

"To preserve an issue for appellate review, a party 'must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection.'" *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006) (quoting *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988)). "When a party fails to timely and properly object at trial to the admission of

---

[4] (...continued)

Fluker Jr. and Roy Fluker III" were deprived of a fair trial and, later, that "Mr. Roy Fluker Jr." previously argued that the Consent Order's admission was improper.

evidence, the party is deemed to have waived the issue on appeal." *Christmas v. City of Chi.*, 682 F.3d 632, 640 (7th Cir. 2012) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 727 (7th Cir. 1999)).

The Government and Roy Jr. stipulated to the Consent Order's admission. When the Government asked at trial to publish portions of it to the jury, Roy Jr.'s counsel stated that he had no objection. By entering into a stipulation with the Government and failing to object at trial to the Consent Order's admission, Roy Jr. made a strategic decision to abandon his challenge of the Consent Order's admissibility. *See United States v. Gaona*, No. 12-2039, 2012 U.S. App. LEXIS 20787, at *11 (7th Cir. Oct. 5, 2012) ("The touchstone of waiver is a knowing and intentional decision." (quoting *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005))). This decision precludes our review of the issue on appeal.

### 2. Roy Jr.'s Prior Felony Convictions

Roy Jr. was convicted of larceny by conversion (failure to return a rental car) on April 29, 1997, and "uttering and publishing" a forged check (forgery) sometime in 2003. He filed a motion *in limine*, citing Rule 609(1), to bar the admission of these convictions. At a pretrial hearing, the district court ruled that the Government could question Roy Jr. regarding the larceny conviction if he testified at trial but deferred its ruling as to the forgery conviction. At the next status date, the parties discussed the forgery conviction and whether the Gov-

ernment intended to introduce it during its case-in-chief. The Government stated it did not, to which Roy Jr.'s counsel responded, "End of the problem." The district court offered no further instructions regarding the forgery conviction.

Roy Jr. contends these determinations amount to an abuse of discretion because the offenses were unduly prejudicial, but he encounters an insurmountable hurdle. During the Government's case-in-chief, the Government did not publish to the jury or question any witnesses about either of Roy Jr.'s convictions.[5] It was not until Roy Jr. testified on direct examination that the jury heard about the two convictions. Roy Jr. alone was responsible for putting the information before the jury, and the Supreme Court has provided us guidance for such a situation: "[A] defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error." *Ohler v. United States*, 529 U.S. 753, 760 (2000). Roy Jr.'s introduction of his prior convictions during his direct examination may have removed their "sting," but it also pre-

---

[5] The Consent Order contained a reference to Roy Jr.'s forgery conviction and his failure to disclose it to participants of the Spend and Redeem Program. The fact that the Consent Order was admitted during the Government's case-in-chief does not, however, affect our analysis because the Government did not publish to the jury, or question anyone about, the section of the Consent Order concerning Roy Jr.'s forgery conviction until Roy Jr. testified.

cluded him from appealing the district court's decision to admit the evidence as well. *See Clarett v. Roberts*, 657 F.3d 664, 670 (7th Cir. 2011).

### 3. Haywood Borders' Emails

The Government introduced a number of emails at trial to rebut Roy III's defense that a mortgage transaction was a personal undertaking that did not involve MTE or the Housing Program. The group of emails at issue includes five separate emails sent to, and received by, Melvin and Jean Norwood—A-Buyers for a Housing Program transaction—at their personal email account. The emails were sent by a "Hayward Borders" at "mte_123@hotmail.com," and dated August 22, 2007; August 28, 2007; September 6, 2007; September 7, 2007; and September 10, 2007. The first email says that MTE's bank accounts will be unfrozen on January 1, 2008, and, acknowledging the Norwood's $108,000 equity payment, gives the Norwoods four options they can pursue regarding their participation in the Housing Program. The second email says the Norwoods' "account and options" in the A-Buyer program are being reviewed, while the third email discusses the Norwoods' current status and rights under the A-Buyer program. The fourth email asks for the Norwoods' full participation regarding how to deal with the "renter" of the property (collect rent from her or tell her she faces eviction), and the fifth email explains how the "renter" will be evicted. Roy III attacks the emails' admissibility on two grounds: (1) the emails were not properly authenticated, and (2) the emails contained inadmissible hearsay.

Rule 901(a) provides that email evidence is admissible if authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Authentication can be established in a variety of ways, including by 'testimony of [a] witness with knowledge . . . that a matter is what it claimed to be[,]' Rule 901(b)(1), and by distinctive characteristics such as 'appearance, contents, substance, [or] internal patterns . . . taken in conjunction with circumstances[,]' Rule 901(b)(4)." *United States v. Dumeisi*, 424 F.3d 566, 574 (7th Cir. 2005) (alterations in original). Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury. *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997).

Borders purportedly authored the emails. At trial, neither Borders nor anyone who saw Borders author the emails testified that the emails were actually sent by Borders. Authentication under Rule 901(b)(1) was, therefore, impossible. *See* Mark D. Robins, *Evidence at the Electronic Frontier: Introducing E-Mail at Trial in Commercial Litigation*, 29 RUTGERS COMPUTER & TECH. L.J. 219, 226 (2003) ("Where a written communication such as an e-mail message is transmitted, only the author of the e-mail message or anyone who saw the author compose and transmit the message will truly 'know' the message's authorship, and be able to authenticate it." (citing 2 JOHN W. STRONG, ET AL., MCCORMICK ON EVIDENCE § 219(a), 687-88 (5th ed. 1989))). Accordingly, the Government attempted to authenticate the emails using circumstantial evidence, which we think was sufficient.

Our conclusion is supported by a number of factors present in the record. The emails sent to the Norwoods had the email address "mte_123@hotmail.com," with the author identified as "Hayward Borders." Even though Melvin Norwood testified that he had never met Borders before receiving the emails, the uncontroverted testimony established that Borders was an MTE Board Member. It would be reasonable for one to assume that an MTE Board Member would possess an email address bearing the MTE acronym and have the capacity to send correspondence from such an address. Moreover, the Norwoods' email address, the address Borders' emails were sent to, was the same address to which Roy III had previously sent his email correspondence regarding the Housing Program. It would also be reasonable to assume that another MTE Board Member, in this case Borders, would have the ability to discover and send emails to the email addresses of Housing Program participants.

The context of the emails further demonstrates the emails' author had significant knowledge of the Norwoods' involvement with the Housing Program and MTE. The emails discuss MTE's frozen bank accounts, the purchased property being part of the A-Buyer program, and the $108,900 of equity from the Norwoods' home that MTE received from the transaction. This is all information Borders would be in a position to know and discuss with the Norwoods. The Eleventh Circuit has found these types of factors to be sufficient to satisfy Rule 901(a)'s authentication requirements for email evidence, *see United States v. Siddiqui*, 235 F.3d

1318, 1322-23 (11th Cir. 2000), and we agree. Roy III's challenge to the authentication of the emails fails.

Directing our focus to Roy III's contention that the emails constituted inadmissible hearsay, this argument is equally unavailing. He contends the emails were "offered to show that Borders made [certain] assertions," but the touchstone of hearsay is that the evidence is being used to prove the *truth* of the matter asserted. *See* Fed. R. Evid. 801(c)(2); *Smith v. Bray*, 681 F.3d 888, 902 (7th Cir. 2012). These emails actually contained a number of false assertions, so they were not offered for their truth.[6] We concur with the Government that these emails were offered to provide context and rebut Roy III's argument at trial that the Norwood transaction was a personal undertaking; one that was separate and apart from MTE. Therefore, the emails were properly admitted.

## B. Ostrich Instruction

Ronnanita challenges the district court's decision to provide the jury with an ostrich instruction. The district court instructed the jury:

---

[6] The email dated Friday, September 7, 2007, contained a reference to a conversation that Hayward Borders had with Roy III. The district court concluded that this reference constituted inadmissible hearsay and ordered that the reference to Roy III be redacted, which the Government did before publishing the email to the jury.

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if he or she was merely negligent in not discovering the truth.

Ronnanita contends the record did not contain the requisite evidence to support the instruction's use. We review a decision to give an ostrich instruction for an abuse of discretion, viewing all evidence in the light most favorable to the Government. *United States v. Green*, 648 F.3d 569, 582 (7th Cir. 2011).

An ostrich instruction is provided to "explain that the law expands the definition of 'knowledge' for purposes of determining whether a defendant committed a specific act. It equates actual knowledge with the deliberate avoidance of knowledge." *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999) (internal citation omitted). In other words, a defendant may not escape criminal liability simply by pleading ignorance "if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings." *United States v. Garcia*, 580 F.3d 528, 536 (7th Cir. 2009) (quoting *Craig*, 178 F.3d at 896). An ostrich instruction may be given when: "(1) a defendant claims to

lack guilty knowledge, i.e., knowledge of her conduct's illegality, and (2) the government presents evidence from which a jury could conclude that the defendant deliberately avoided the truth." *Green*, 648 F.3d at 582 (emphasis removed) (quoting *Garcia*, 580 F.3d at 536). Deliberate avoidance may involve physical effort, *United States v. Pabey*, 664 F.3d 1084, 1092-93 (7th Cir. 2011), or be purely psychological—e.g., "a cutting off of one's normal curiosity by an effort of will." *United States v. Giovannetti*, 919 F.2d 1223, 1228-29 (7th Cir. 1990).

Ronnanita has maintained throughout that she had no knowledge of the scheme being a sham; element one is easily satisfied. The testimony presented at trial satisfied the second element as well: Ronnanita was described as being "second in command" to Roy Jr. and the person to go to with questions or concerns. She was intimately familiar with the 200% returns promised to participants as well as MTE's expenses, both necessary (rent) and extravagant (trips and cars). Ronnanita opened bank accounts for Roy Jr. and MTE and made monetary transfers between the accounts. She also knew when the Housing Program had difficulties meeting its payment obligations. Based on Ronnanita's access to this information, she could have chosen at any point to investigate what investments MTE was making and what returns MTE was generating. This would have immediately demonstrated the fraudulent nature of the schemes. Ronnanita claims she simply followed Roy Jr.'s orders, but her failure to inquire further in light of the information she possessed is evidence that could lead a reasonable jury to conclude she

deliberately avoided learning the truth about MTE's programs. *See Craig*, 178 F.3d at 897-98; *see also United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006) (holding that "red flags" and a failure to ask questions about them demonstrates deliberate avoidance). This is precisely the type of situation that warrants an ostrich instruction. *See United States v. Paiz*, 905 F.2d 1014, 1022 (7th Cir. 1990) ("Such a scenario, one in which 'the defendant acknowledges [her] association with the group but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity,' is a paradigm case for use of the 'ostrich' instruction." (quoting *United States v. Diaz*, 846 F.2d 544, 550 (7th Cir. 1988))). We find the district court appropriately gave the ostrich instruction.

## C.  Sentencing Calculations[7]

Having addressed the Appellants' complaints about the trial, we turn our attention to Ronnanita and Roy III's sentencing objections. We review the district court's application of the Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. McCauley*, 659 F.3d 645, 652 (7th Cir. 2011). Findings of fact are clearly erroneous only when, "after considering all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made."

---

[7] The Appellants' PSR offense level calculations were determined pursuant to the November 2009 edition of the Guidelines Manual.

*United States v. Rice*, 673 F.3d 537, 540 (7th Cir. 2012) (quoting *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010)).

### 1.   Ronnanita

Over Ronnanita's objection, the district court accepted the PSR's findings, which included several sentencing enhancements. After the application of these enhancements, the district court determined Ronnanita's final offense level to be 36 and her criminal history category to be II, resulting in an advisory Guidelines range of 210 to 262 months' imprisonment. The district court went below the advisory range and sentenced Ronnanita to 96 months' imprisonment and two years' supervised release on each count to be served concurrently. Ronnanita challenges her sentence, contending it would have been less had her guideline range been lower.

### a.   Role in the Scheme Enhancement

Ronnanita first argues that the district court erred in applying U.S.S.G. § 3B1.1(b), which calls for a three-level enhancement if "the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or *was otherwise extensive*[.]" (emphasis added). The Sentencing Guidelines define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1 cmt. n.1. We have explained that this means a participant "*could have* been charged," even if only

as an accessory; but "mere knowledge of a conspiracy" is insufficient to establish that a person was "criminally responsible." *United States v. Pabey*, 664 F.3d 1084, 1097 (7th Cir. 2011). Ronnanita claims five people were not "criminally responsible" for the scheme, so the three-level enhancement was inappropriate.

The parties agree that the Appellants were each "participants" in the scheme; that makes three. The dispute between them focuses on whether other individuals—Jacqueline Hawkins and Jennifer Washington (MTE employees) and Phillip Rowe, Eric Blount, and Clarence Jones (mortgage company employees)—qualify as participants under Section 3B.1(b). We decline to decide whether these other individuals qualify as participants because we believe the entire scheme easily satisfies the "otherwise extensive" provision, so the number of "participants" does not matter. *See United States v. Hussein*, 664 F.3d 155, 162 (7th Cir. 2011).

Section 3B1.1, commentary note 3 states, "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." In determining whether a scheme is otherwise extensive, we have considered: (1) the monetary benefits obtained during the scheme; (2) the length of time the scheme continued; (3) the number of people utilized to operate the scheme; and (4) the scheme's geographic scope. *See, e.g.*, *United States v. Figueroa*, 682 F.3d 694, 696 (7th Cir.

2012); *Pabey*, 664 F.3d at 1097; *Hussein*, 664 F.3d at 162; *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010). We have also held that a scheme is otherwise extensive if the number of participants plus outsiders who unwittingly advance a conspiracy is greater than five. *See, e.g.*, *United States v. Tai*, 41 F.3d 1170, 1174-75 (7th Cir. 1994).

At the bare minimum, the participation of the Appellants, plus at least Hawkins, Washington, and one other MTE Board Member, satisfies this "greater than five" standard, regardless of whether Hawkins and Washington were "criminally responsible." *See Pabey*, 664 F.3d at 1097 (citing *Tai*, 41 F.3d at 1174-75). This number does not even include the additional MTE Board Members, the other MTE employees who helped organize venue meetings in numerous states, the mortgage company employees, or the numerous A-Buyers used to further the Housing Program. We believe the scheme was also extensive with respect to the amount of money obtained (over $18 million), the intended geographic scope (at least six states), the number of people affected (over 3,000), and the overall complexity (using straw buyers to facilitate Housing Program transactions). Thus, the scheme qualifies as "otherwise extensive" under U.S.S.G. § 3B.1(b), and the three-level enhancement was correct.

### b.  Assignment of Criminal History Category

Ronnanita next contests the district court's calculation of her criminal history category. The PSR assessed one criminal history point to Ronnanita pursuant to U.S.S.G. § 4A1.1(c) for a conviction of larceny by conversion

on July 18, 2005. Ronnanita received a twelve-month probation sentence, plus a fine, for that conviction. Section 4A1.1(d) states that two points should be added "if the defendant committed the instant offense while under any criminal justice sentence, including probation[.]" Accordingly, the PSR applied two additional criminal history points because Ronnanita's criminal charges were committed while Ronnanita was still on probation for the larceny conviction, which she was not discharged from until May 15, 2006. A criminal history category II was thus designated, which corresponds to the three criminal history points assigned to Ronnanita.

Ronnanita claims this criminal history category was incorrect because four of the eight counts on which she was convicted occurred after she was discharged from probation on May 15, 2006. We first note Ronnanita's failure to object to her criminal history calculation in the district court, so we only review for plain error. *See United States v. Vasquez*, 673 F.3d 680, 684 (7th Cir. 2012). But regardless of the standard applied, Ronnanita's argument easily fails because all that is required under U.S.S.G. § 4A1.1(d) is for "any relevant conduct" of the offense to have been committed while the defendant was on probation, *see* § 4A1.1 cmt. n.4, not the instant offense "in its entirety" as Ronnanita claims. Therefore, because the evidence at trial established that Ronnanita's participation in the overall scheme began in early 2005 and continued at least into 2007, Ronnanita engaged in conduct related to her convictions while on probation, and the district court did not err in calculating her criminal history category.

### c.  Loss Calculation

Ronnanita also contests the district court's calculation of the loss attributable to her offenses. The PSR calculated the loss suffered by the individuals involved in the Spend and Redeem Program and the Housing Program to be between $8,579,052 and $10,783,961. Under the Sentencing Guidelines, a loss in excess of $7,000,000 but less than $20,000,000 corresponds to a twenty-level increase in the defendant's offense level, *see* U.S.S.G. § 2B1.1(b)(1)(K); Ronnanita's offense level was, therefore, increased by twenty levels.

Ronnanita did not provide the Probation Office or the district court with any information regarding a loss figure. Her challenge to the calculation is nonetheless two-fold: (1) her participation and responsibilities were almost entirely related to the Housing Program, so she should only be attributed losses related to the Housing Program (roughly $2,600,000); and (2) the losses attributed to Roy III at his sentencing hearing on August 16, 2011, eight months after she was sentenced, were only $7,336,957.49, so the amount attributed to her was approximately $3,400,000 too high. We address each argument in turn.

From the outset, Ronnanita's argument that the evidence demonstrated she only had "tangential conduct with the Spend and Redeem Program" is completely without merit. As discussed above, Ronnanita actively facilitated participation in both the Spend and Redeem Program and the Housing Program. She was "second in command" and the person to go to with problems. She

also transferred money between numerous accounts, and that money was connected to both programs. The evidence presented at trial established that Ronnanita was fully involved with both the Spend and Redeem Program and the Housing Program; the district court properly attributed the losses of both programs to her.

Generally, because Ronnanita did not raise her second contention—that the losses attributed to Roy III for the same programs were $3,400,000 less—until her reply brief, her argument would be waived. *See Griffin v. Bell*, No-11-3389, 2012 U.S. App. LEXIS 18599, at *9 (7th Cir. Sept. 4, 2012) ("[A]rguments raised for the first time in a reply brief are deemed waived."). However, we have stated that "exceptional circumstances" may allow us to consider arguments that would otherwise be waived. *See In re Busson-Sokolik*, 635 F.3d 261, 268-69 (7th Cir. 2011). This issue is one of those rare situations. Ronnanita filed her amended brief with this Court on June 1, 2011; Roy III was not sentenced until August 16, 2011. It would have been impossible for Ronnanita to know what the loss amount attributed to Roy III would be two months into the future, so we will reach the merits of Ronnanita's second contention.

Ronnanita correctly points out that the loss amounts attributed to her and Roy III were inconsistent, but she fails to explain why this difference is consequential. Even if we assume that Ronnanita had been sentenced on the same day as Roy III and the district court accepted the same loss calculation given to Roy III ($7,336,957.49), that amount is still greater than the $7,000,000 threshold of

U.S.S.G. § 2B1.1(b)(1)(K). Ronnanita's loss calculation would still result in a twenty-level increase of her offense level. "To find clear error we must be persuaded that the sentencing court made a fundamental error which resulted in a complete miscarriage of justice." *United States v. Schaefer*, 384 F.3d 326, 332 (7th Cir. 2004) (quoting *United States v. Hatchett*, 31 F.3d 1411, 1423-24 (7th Cir. 1994)). Ronnanita has not put forth any support for the proposition, and we perceive no reason to believe, that this difference had any effect on the administration of justice, so we find that no clear error occurred.

### d.  Calculation of Victims

The PSR concluded that approximately 3,000 individuals participated in the programs and approximately 1,900 individuals lost money in the scheme. Pursuant to U.S.S.G. § 2B1.1(b)(2)(C), the PSR applied a six-level increase because the offense involved more than 250 victims. Ronnanita again claims the number of victims apportioned to her is erroneous because she was only actively involved in the Housing Program. For the same reasons we believe the losses allocated to her were correct, we believe the calculation of victims was also appropriate.

### 2.  Roy III

The district court accepted a loss calculation of $7,336,957.49 before it sentenced Roy III to, among other

conditions, ninety-six months' imprisonment. Roy III contends he did not have "the requisite *mens rea*" to be held liable for the losses from either the Spend and Redeem Program or the Housing Program because he was fooled just like the investors. In his eyes, he should not be held accountable for any of the losses. The problem for Roy III is the evidence demonstrates that the overall scheme he was convicted of participating in included both programs. As the district court stated at Roy III's sentencing, "[The Spend and Redeem and Housing Programs] were not two separate operations. They were interrelated components of the same MTE, More Than Enough, operation." We think the evidence regarding Roy III's participation at venue meetings, involvement with the Norwood transaction, and knowledge of the "inherent implausibility" of the promised returns (for both programs) amply support a finding that Roy III knew both programs were fraudulent, yet continued to actively participate in their operation. There was no error in the calculation of the losses attributed to Roy III.

## III. CONCLUSION

Finding that the Appellants' contentions lack merit, we AFFIRM the Appellants' convictions and sentences.