In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-3769 & 13-1378

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BENITO SALINAS and RODOLFO
VARGAS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 795 — **Charles R. Norgle**, *Judge.*

ARGUED APRIL 18, 2014 — DECIDED AUGUST 18, 2014

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* Rodolfo Vargas ("Vargas") and Benito
Salinas ("Salinas") were convicted of conspiracy to possess
with intent to distribute marijuana in violation of 21 U.S.C.
§§ 841 and 846 (Count One), as well as two counts each of
using telephones in furtherance of the conspiracy in violation
of 21 U.S.C. § 843(b) (Counts Two, Three, Four, and Five).
Vargas pleaded guilty to Count One, and was sentenced to 121

months' imprisonment. Salinas proceeded to trial and was convicted on Counts One, Four, and Five. He was sentenced to 120 months' imprisonment.

Vargas now appeals his sentence, claiming that the district court erroneously imposed a three-level enhancement for his role as a manager or supervisor of the conspiracy, unduly lengthening his sentence. Salinas appeals as well, on different grounds. He contends that the evidence presented at trial was insufficient to uphold his conviction and that an erroneous jury instruction prejudiced his case. We uphold the decisions of the district court with respect to both defendants.

## I. BACKGROUND

In February 2011, the Drug Enforcement Administration ("DEA") began to investigate Jorge Villa ("Villa"), a known Chicago drug dealer. Though Villa was the focus of their investigation, the DEA also targeted Vargas, Villa's supplier. To further their investigation, the DEA received permission to wiretap 19 phones from June 2011 to November 2011. Villa owned two of the wiretapped phones.

In the summer of 2011, Vargas served as the middleman for three drug transactions between Villa and a Mexico-based supplier. Vargas supplied the drugs up front to Villa without requiring payment at the time of delivery with the understanding that Villa would pay him for the drugs after he sold them. On July 18, 2011, Vargas called Villa and told him that he obtained 1,000 pounds of marijuana for him; Villa confirmed

that he would send someone to pick it up.[1] Following the call, Villa sent Armando Vega-Medina[2] ("Armando"), his courier, to pick up the marijuana. Armando and Villa then distributed the marijuana to customers and collected payment.

On August 5, 2011, Vargas spoke with Villa in a series of telephone calls. Vargas said that his courier, Salinas, would come to pick up the money Villa owed him for the 1,000 pounds of marijuana that he fronted him in July. Vargas also instructed Villa on how to package the money for transport. He explained that the money needed to be carefully packaged a certain way so that it would fit into hidden compartments in Salinas' tractor-trailer. He said, "[I]f it doesn't fit in the refrigerator [unit of Salinas' trailer] … he is going to reject it." Vargas then gave Salinas' phone number to Villa and told him to make arrangements to meet with Salinas.

On the morning of August 6, 2011, Vargas and Villa made arrangements in a telephone conversation. They discussed where Salinas would meet with Villa's courier, Armando. Vargas told Villa to keep him informed of any updates. Shortly

---

[1] Villa was additionally indicted and charged with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846. On July 9, 2012, he pleaded guilty. In exchange for a lighter sentence, Villa agreed to testify at Salinas' trial.

[2] The transcripts from Salinas' trial conflict with appellants' and appellee's briefs regarding Armando's last name. At trial, Villa called his courier "Armando Vargas;" DEA agents identified him as "Armando Vega." Salinas' brief refers to the man only as "Armando," whereas Vargas' and the government's briefs refer to him as "Armando Vega-Medina." To mitigate the confusion, we will refer to him as "Armando" here.

thereafter, Villa called Salinas to tell him that Armando would call Salinas' phone and pick him up "in about ten minutes."

DEA agents were surveilling Armando at this time. Armando left his residence and drove to the Rio Valley Market where he met with Salinas. They left in Armando's car and drove back to his house. Agents observed the two entering Armando's residence; about an hour later, they were seen exiting the house, and Salinas was carrying a large black duffel bag. Armando drove Salinas back to the market. Salinas carried the black duffel bag to the rear end of his tractor-trailer and spent about thirty minutes inside the trailer with the doors closed. Salinas then returned to the driver's seat and drove away.

DEA Agent Berghofs followed Salinas' tractor-trailer. As Salinas approached the Illinois-Indiana border, Berghofs contacted the Indiana DEA as well as Indiana State Police ("ISP") for assistance. ISP then began following Salinas. At approximately 5:30 p.m., ISP activated its lights in Indiana and stopped Salinas' tractor-trailer in New Buffalo, Michigan, just one mile over the border.

Michigan State Trooper Russell Bawks ("Bawks") arrived and asked Salinas about his travel plans. Salinas stated that he had carried a load of broccoli from St. Louis to Illinois, and that he was now traveling to Michigan to pick up cucumbers which he planned to transport back to Texas. Bawks then asked Salinas for consent to search his tractor-trailer; Salinas consented. Bawks told Salinas they were looking for money, and specifically asked Salinas if he had more than $10,000 in his tractor-trailer. Salinas said he did not have money in the

tractor-trailer. Inside the trailer, Bawks found a bag filled with several tubes of caulk, a caulk gun, and a putty knife covered in fresh caulk; he also noted that the trailer smelled of fresh caulk. Bawks then discovered cuts in the fiberglass wall of the trailer which were covered in fresh caulk and concealed behind the trailer's refrigeration unit. He asked Salinas to help him access the compartments so that they could avoid damaging the trailer. At this point, Salinas admitted he had $311,000 concealed in the trailer, and helped police access two hidden compartments where he stored the money. The $311,000, wrapped in plastic wrap and duct tape and packaged in heat-sealed bags, had been concealed in two freshly-caulked lead-lined compartments.

Salinas claimed the money was his, so Michigan police took him to the station for an interview. He was read his *Miranda* rights, and agreed to speak to police. He claimed the $311,000 was his life savings and that he kept the money in his trailer because he did not trust banks. Police then seized the $311,000, along with Salinas' cell phone and his tractor-trailer. They told Salinas that if he wanted to get the money back, he could submit a Notice of Claim form. Salinas posted a $5,000 bond and attempted to reclaim the seized money by submitting a Notice of Claim form. When the form asked about his "interest in the property," Salinas again claimed that the money was his.

On August 8, 2011, Vargas phoned Villa and told him to stop using his phone because Salinas had been stopped by police and his phone had been confiscated; Vargas was concerned that the police "might've gotten some numbers off of it."

On November 7, 2011, Salinas and Vargas were arrested. On November 9, they were indicted and charged by a grand jury; a superseding indictment was filed on November 30, 2011. On December 7, 2011, Salinas and Vargas pleaded not guilty; Vargas later changed his plea to guilty, but Salinas proceeded to trial.

### A. Vargas' Plea Deal and Sentencing

Vargas pleaded guilty to conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846 (Count One); the government dismissed the other counts against him. Vargas admitted that he was responsible for 1,723 kilograms of marijuana, which placed him at a base offense level of 32 under U.S.S.G. §§ 2D1.1(a)(5) and (c)(4). The district court allowed a three-level reduction for Vargas' acceptance of responsibility, dropping his total offense level to 29. The probation officer, however, recommended a three-level enhancement under § 3B1.1(b) due to Vargas' role as a manager or supervisor in the conspiracy, since Vargas "oversaw" the delivery of the marijuana and the proceeds, was a contact person for Villa, gave Salinas' phone number to Villa, and provided instructions on how to package the drug money. With the enhancement, Vargas' resulting guidelines range was 121–151 months.[3]

Vargas objected to the manager/supervisor enhancement arguing that it should not be imposed since he acted only as a

---

[3] Without the enhancement, Vargas would have qualified for the "safety valve" provision, which would have dropped his applicable guidelines range to 70–87 months.

messenger and a middleman. He claims that he did not act as a manager or supervisor because he did not exercise decision-making authority, recruit members, or have control over other participants. He also pointed out that he did not set the price of the drugs, handle the drugs or the proceeds, and received only a small fee for his services ($25 per pound of marijuana).

The district court considered Vargas' objection to the enhancement but overruled it. In reaching its conclusion, the court relied on the probation officer's recommendation in the Presentence Investigation Report, the evidence presented at Salinas' trial such as the intercepted phone conversations implicating Vargas, as well as Vargas' recitation of facts in his plea declaration. The court sentenced Vargas to 121 months in prison, a four-year term of supervised release, and a special assessment of $100. Vargas timely appealed his sentence.

### B.  Salinas' Trial

The government presented several witnesses at trial, including DEA Special Agent Charles Baumgartner ("Baumgartner"), who was qualified as an expert witness. He testified about the methods used by drug traffickers to conceal money, including using hidden compartments and packaging the money in tape-wrapped, heat-sealed bundles. He also noted that lead-lined compartments, like the two Salinas had built in his trailer, are often used by drug traffickers to conceal their contents from law enforcement since X-ray machines cannot penetrate them. He testified that the bundles of money taken from Salinas' trailer were consistent with the way drug proceeds are bundled.

After the government rested its case, Salinas moved for judgment of acquittal. He claimed that the government failed to prove beyond a reasonable doubt that he either knew that the conspiracy involved illegal drugs or that he deliberately avoided learning that the money he transported was connected to illegal drugs. In response to Salinas' motion, the government highlighted the evidence that would allow the jury to reasonably conclude that Salinas either knew that the money was connected to illegal drugs or that he deliberately avoided learning the truth about the origin of the money. The government pointed to the wiretapped conversation between Salinas and Villa, Salinas' collection and transportation of the money, his surreptitious interactions with Armando, his efforts to conceal the uniquely-packaged money in his trailer, and his initial denials that he had over $10,000 in his tractor-trailer followed by his admission he was in fact carrying $311,000. Moreover, even after the police discovered the hidden money, Salinas lied that the money was actually his life savings and filed a Notice of Claim form in an attempt to recover the money as his own. Based on this evidence, the court concluded that a jury could find every element of the charges beyond a reasonable doubt and so denied Salinas' motion for judgment of acquittal.

Towards the end of trial, the parties agreed on a set of jury instructions. One of the government's proposed instructions taken from the Pattern Criminal Federal Jury Instructions for the Seventh Circuit (1999), commonly referred to as the "ostrich instruction," stated:

> When the word "knowingly" or the phrase "the defendant knew" is used in these instructions, it means that the defendant realized what he was doing and was

aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by a defendant's conduct, and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word.

Salinas did not object to the use of this instruction. The jury found Salinas guilty on all counts. Following trial, Salinas filed a motion for a new trial, but the court denied his motion. He now appeals his sentence, claiming both that the evidence presented by the government at trial was insufficient to convict him and that the ostrich instruction given at his trial was prejudicial.

## II. DISCUSSION

Since Salinas and Vargas appeal on different grounds, we will discuss each defendant in turn. We begin with Vargas' objection to the three-level manager/supervisor enhancement that was applied to his sentence.

### A. Vargas' Objection to the Manager/Supervisor Enhancement

The district court's decision to apply an enhancement is reviewed for clear error. *United States v. Johnson,* 489 F.3d 794, 796 (7th Cir. 2007). We will reverse a district court's application

of an enhancement only if a review of the evidence leaves us with "the definite and firm conviction that a mistake has been made." *Id.*

Section 3B1.1(b) of the Federal Sentencing Guidelines permits the court to apply a three-level enhancement to a defendant's sentence if the district court finds that the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). While § 3B1.1 never expressly defines the terms "manager" or "supervisor," the terms "should be straightforwardly understood as someone who helps manage or supervise a crime scheme." *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012). The Federal Sentencing Guidelines list seven factors that the court may consider when deciding whether the § 3B1.1 enhancement should be applied: (1) the defendant's exercise of decision-making authority, (2) the nature of his participation in the commission of the offense, (3) the defendant's recruitment of accomplices, (4) the defendant's right to a larger share of the fruits of the crime, (5) the degree of the defendant's participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority the defendant exercised over others. U.S.S.G. § 3B1.1, commentary n.4; *United States v. Vaughn*, 722 F.3d 918, 935 (7th Cir. 2013). These factors, however, need not be given equal weight, and the key inquiry is "whether the defendant exercised some control over at least one other participant." *United States v. Mustread,* 42 F.3d 1097, 1104, n.3 ("[S]lavish adherence to [the factors] is unnecessary: the ultimate question is what relative role the defendant played.").

While serving as a mere middleman in a drug distribution chain is not enough to qualify the defendant as a manager or supervisor, a defendant may be considered a manager or supervisor if he "tells people what to do and determines whether they've done it," *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012), or exerts "at least indirect control over [others] … as they did what he wanted, when he wanted it and where he wanted it done." *United States v. Richards*, 198 F.3d 1029, 1034 (7th Cir. 2000).

In *Figueroa,* we affirmed the district court's imposition of a three-level manager/supervisor enhancement to the defendant's sentence even though he claimed that he was "merely transmitting orders" and "had no discretion." 682 F.3d at 697. We noted that the defendant continuously supervised another man, told him where to get drugs, where to deliver drugs, and how to get paid. *Id.* at 697–98. In affirming the enhancement, we explained that "[a] supervisor, a manager, tells people what to do and determines whether they've done it" and "[t]hat was the defendant's job." *Id.* at 697.

Similarly, in *United States v. Ortiz*, 463 Fed. Appx. 580, 581 (7th Cir. 2011), we affirmed the district court's imposition of a § 3B1.1(b) enhancement based on the defendant's role in a drug conspiracy. The defendant recruited another man to participate in the conspiracy, exercised control over him by giving him directions and a vehicle containing hidden compartments to transport drugs, and compensated him for his participation. *Id.* In light of the defendant's "relative responsibility and control over other participants," we found that the district court was "amply justified" in imposing a manager/supervisor enhancement. *Id.*; *see also United States v. Hicks*, 418 Fed. Appx. 534, 536

(7th Cir. 2011) (upholding the district court's application of a § 3B1.1(b) enhancement to the defendant's sentence when he "had both relative responsibility and control over other coconspirators").

Here, Vargas had both relative responsibility in telling others what to do and exerted at least indirect control over them. Vargas arranged the marijuana delivery to Villa, put Villa in contact with Salinas so that the drug proceeds could make their way back to Mexico, and instructed Villa how to package the drug money so that it would fit in the hidden compartments in Salinas' trailer. After Salinas was stopped and arrested, Vargas called Villa to explain what had happened and cautioned Villa to stop using his phone so that he would not be apprehended as well. Though Vargas downplays his role in the conspiracy, his activities more than suffice to qualify him as a manager or supervisor. Therefore, the district court was well within its discretion to impose the manager/supervisor enhancement.

## B. Salinas' Sufficiency of the Evidence Challenge

Salinas argues that the district court erred when it failed to grant his motion for judgment of acquittal as well as his motion for a new trial. He contends that the evidence presented by the government at trial was insufficient to demonstrate that either he knew that the money was connected to illegal drugs or that he was willfully blind to that fact.

In a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979). We will uphold a jury's verdict unless "the record is devoid of the evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Mire*, 725 F.3d 665, 678 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 856 (7th Cir. 2012)).

To convict a defendant of conspiracy under §§ 841 and 846, the government must prove the existence of a conspiracy to possess with intent to distribute a controlled substance, and that the defendant knowingly or intentionally became part of the agreement. *Mire*, 725 F.3d at 679. The government must put forth "substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999). The defendant must also know that the substance in question is a controlled substance. *United States v. Turcotte*, 405 F.3d 515, 525 (7th Cir. 2005). "A jury may consider evidence of the activities surrounding a defendant in determining the defendant's knowledge of the conspiracy." *Thornton*, 197 F.3d at 254.

The defendant's knowledge can be proven directly or by demonstrating that the defendant deliberately avoided learning about the drugs. *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012). "[A] defendant may not escape criminal liability simply by pleading ignorance 'if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature and extent of those dealings.'" *Id.* (quoting *United States v. Garcia*, 580 F.3d 528, 536 (7th Cir. 2009)). The main question is "what the defendant knew and whether that knowledge raises a reasonable inference that [he] remained deliberately ignorant

of facts constituting criminal knowledge." *United States v. Ramirez*, 574 F.3d 869, 877 (7th Cir. 2009). "The circumstances surrounding the defendant may be sufficient to infer that, given what the defendant knew, he must have forced his suspicions aside and deliberately avoided confirming for himself that he was engaged in criminal activity." *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007).

Salinas admits that he knew he was transporting $311,000 in hidden compartments in his trailer from Chicago to Texas, and does not contest the fact that the money found in his trailer came from drug sales. His only argument is that the government failed to meet its burden of proving that he knew that the money came from the sale of controlled substances or that he deliberately avoided finding out it was so connected.

Despite his assertions, the jury could have easily determined, based on Salinas' actions and the surrounding circumstances, that he either knew the money was linked to illegal drugs or deliberately looked the other way. Salinas spoke to Villa, a known drug trafficker, and arranged to pick up $311,000 from Villa's courier, Armando. Despite the large amount of money, Salinas never asked where the money came from. In addition, Salinas had specially-designed two lead-lined compartments built into his trailer in order to transport the money, which was concealed from view and difficult to access. At trial, the jury heard testimony from the government's drug trafficking expert, Baumgartner, that lead-lined compartments, like the ones Salinas had built in his trailer, are often used by drug traffickers to conceal their contents from law enforcement. Salinas also knew the money would only fit in the hidden compartments if it was packaged a certain way,

so he went to Armando's home to inspect the way the money had been packaged to ensure that it would fit.

When Salinas was stopped by police, he consistently lied to them about the money he was transporting. Initially, he told Bawks that he did not have over $10,000 in his tractor-trailer. Only after police searched his trailer and discovered the hidden compartments did Salinas change his story and admit that he had $311,000 stashed in his trailer. At this point, Salinas lied again, telling Bawks that the money was his life savings even though he had received the money from Armando just hours before. Salinas then attempted to continue the charade by protesting the seizure of the $311,000, filing a false Notice of Claim form, and asserting once again that the money belonged to him. These facts provided more than ample grounds for the jury to conclude that Salinas either knew that the $311,000 was linked to illegal drugs or that he just simply chose not to know.

### C. Salinas' Objections to the Ostrich Instruction

#### i. The District Court's Decision to Give the Ostrich Instruction

Salinas also contends that the district court committed plain error when it gave the ostrich instruction at his trial. The ostrich instruction should be given only where the defendant claims to lack guilty knowledge and the government presents evidence from which a jury could conclude that the defendant deliberately avoided learning the truth. *Fluker*, 698 F.3d at 1000–01. Here, Salinas claims he did not know that the money in his tractor-trailer was linked to illegal drugs, so we need only determine whether the government presented sufficient evidence from which the jury could have concluded that

Salinas deliberately avoided learning the truth about the money.

Salinas never objected to the ostrich instruction at trial, so we review the court's decision to give the instruction for plain error. *United States v. Colvin*, 353 F.3d 569, 577 (7th Cir. 2003). To prevail under this standard, Salinas must prove that the district court's decision to give the ostrich instruction improperly influenced the jury's verdict. *United States v. Olano*, 507 U.S. 725, 735 (1993).

Though Salinas admits that he spoke with Villa, met with Armando, and agreed to transport the $311,000, he contends that he simply followed instructions on how to transport the cash and had no knowledge that the money stemmed from drug activity. His actions, however, indicate otherwise—that either he knew the money came from drug sales or deliberately avoided learning the truth. The government presented evidence at trial demonstrating that Salinas had reason to question the origin of the money he was transporting. Salinas was contacted by Villa, a known drug trafficker, to arrange for the transportation and delivery of a large sum of money. Without asking Villa any questions about where the money came from, Salinas agreed to meet with Armando, a complete stranger, and to go to his house. There, Salinas carefully inspected the money, which had been heat-sealed and specially packaged. Salinas still asked no questions. Furthermore, Salinas had two special lead-lined compartments built inside his trailer. He planned to transport the money in these compartments, and would not accept the money from Armando unless it would fit inside. When Salinas was stopped by law enforcement, he lied about transporting the money; when the hidden compartments

in his trailer were discovered, he admitted he was carrying $311,000, but then lied to the police again, claiming that the money was his life savings. Based on these facts, a jury could have reasonably concluded that Salinas either knew the money was linked to illegal drugs or strongly suspected that the money came from illegal drug activity, but failed to ask questions simply because he did not want to know. We find that it was not plain error for the district court to give the ostrich instruction.

### ii. Salinas' Objection to the Language of the Ostrich Instruction

Salinas also argues that the language of the ostrich instruction was improper, and allowed the jury to convict him of mere negligence.

The ostrich instruction given at Salinas' trial was the Pattern Criminal Jury Instruction for the Seventh Circuit at the time. It states:

> When the word "knowingly" or the phrase "the defendant knew" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by a defendant's conduct, and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may

conclude that he acted knowingly, as I have used that word.

We will reverse a district court's decision to give a jury instruction "only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013) (quoting *United States v. Curry*, 538 F.3d 718, 731 (7th Cir. 2008)).

Even though the ostrich instruction given at Salinas' trial did not specifically state that the defendant could not be convicted for "mere negligence," it made it clear to the jury that the defendant needed to "realiz[e] what he was doing and [be] aware of the nature of his conduct, and … not act through ignorance, mistake or accident." The instruction required the jury to find that Salinas acted "knowingly," consciously "shut[ting] his eyes for fear of what he would learn," so we find no error.

Salinas further argues that we should find the instruction erroneous because the Committee on Federal Criminal Jury Instructions of the Seventh Circuit substantially revised the ostrich instruction several months after his trial. The Committee Comment after Section 4.10 reads:

> [The] "ostrich" instruction[] will not be appropriate in every case in which knowledge is an issue. Such an instruction is appropriate "where (1) the defendant claims a lack of guilty knowledge, and (2) the government has presented evidence sufficient for a jury to conclude that the defendant deliberately avoided learning the truth." *Carani*, 492 F.3d at 873 (citing *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006)).

Deliberate avoidance is more than mere negligence; "the defendant must have 'deliberately avoided acquiring knowledge of the crime being committed by cutting off his curiosity through an effort of the will.'" *Id.* at 873 (quoting *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006)). "[E]vidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant." *Carrillo*, 435 F.3d at 781 (citing *United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993) (explaining that it is improper to use an ostrich instruction "to convict [a defendant] on the basis of what [he] should have known")).

Though the Committee on Federal Criminal Jury Instructions of the Seventh Circuit revised the prior pattern criminal jury instruction to include an express statement that deliberate avoidance needs to be more than mere negligence, this does not mean that the prior pattern criminal jury instruction was an incorrect statement of the law. Though it used different language than the current instruction, the instruction made clear that Salinas needed to "realiz[e] what he was doing and [be] aware of the nature of his conduct, and … not act through ignorance, mistake or accident." The instruction "fairly and accurately summarized the law," *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003), so we find no error.

Finally, Salinas cites the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), a civil case that narrowed the definition of "willful blindness," explaining that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of

wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070–71. He now urges us to apply that definition to Salinas' case. While several of our sister circuits have mentioned incorporating *Global-Tech'*s definition into their criminal jury instructions for knowledge (*see, e.g.*, *United States v. Brooks*, 681 F.3d 678, 702 n.19 (5th Cir. 2012) ("although *Global-Tech* was a civil case, the standard seems to apply equally in criminal deliberate ignorance cases"); *United States v. Ferguson*, 676 F.3d 260, 278 n.16 (2d Cir. 2011) ("[T]he Supreme Court appears to now prefer the appellation of 'willful blindness' … which uses 'conscious avoidance'"); *United States v. Butler,* 646 F.3d 1038, 1041 (8th Cir. 2011) (citing *Global-Tech* in defining willful blindness), we have yet to do so. And even if we were to do so, the result in Salinas' case would be the same. The government presented sufficient evidence supporting a finding that Salinas either knew that the money he transported was linked to illegal drugs or deliberately avoided such knowledge, so any error related to the ostrich instruction given at Salinas' trial would have been harmless.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.